# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRENDA WILSON**
   **Plaintiff,**

  **v.**           **Case No. 06-CR-0401**

**JO ANNE B. BARNHART**
**Commissioner of the Social Security Administration**
    **Defendant.**

---

## DECISION AND ORDER

   Plaintiff Brenda Wilson brings this action under 42 U.S.C. § 405(g) seeking judicial review of the denial of her claim for disability insurance benefits ("DIB"). In her application, plaintiff alleged that she was unable to work due to various conditions including psoriasis, fibromyalgia, depression and anxiety, but the Social Security Administration ("SSA") denied her claim, as did an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council declined to review the ALJ's decision, making it the final decision of the SSA for purposes of judicial review. See Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006).

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

   Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review is limited to determining whether the decision was supported by substantial evidence and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person would

accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. Binion on Behalf of Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id.; see also Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

## B. Proof of Disability

Under the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). She must show that her "impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520; 416.920. Under this test, the ALJ must determine: (1) whether the claimant is presently engaged in substantial gainful activity

2

("SGA");[1]; (2) if not, whether the claimant has a severe impairment or combination of impairments;[2] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[3] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work;[4] and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. E.g., Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The claimant will automatically be found disabled if she makes the requisite showing at steps one through three. If the claimant is unable to satisfy step three, she must then demonstrate that she lacks the RFC to perform her past work. If she makes this showing,

---

[1]"Substantial" work activity involves doing significant physical or mental activities. "Gainful" work activity is work done for pay or profit. 20 C.F.R. § 404.1572.

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[3]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings"). In order to be found disabled at step three, the claimant must satisfy all of the specific criteria of a particular Listing. For example, the Listings of mental impairments consist of three sets of criteria – the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). If the claimant presents medical evidence sufficient to demonstrate an impairment under the A criteria, the SSA will rate the degree of functional limitation under the B criteria in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The SSA rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do SGA. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas. See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

[4]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96-8p.

3

the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. The Commissioner may carry this burden either by relying on the testimony of a vocational expert, who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the claimant's range of work. In such a case, the Commissioner must solicit the testimony of a VE. E.g., Patterson v. Barnhart, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006).

## II. FACTS

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on August 18, 2003, alleging that she had been unable to work since October 4, 2002 due to arthritis, psoriasis, chronic fatigue, fibromyalgia, depression and anxiety. (Tr. at 71, 80, 92.) On November 20, 2003, the SSA denied her claim. (Tr. at 24, 30.) Plaintiff sought reconsideration, but the SSA affirmed the denial on March 25, 2004. (Tr. at 25, 35.) On July 9, 2004, plaintiff requested a hearing before an ALJ, but on August 12, 2004, the ALJ dismissed the request as untimely.[5] (Tr. at 26-29.) Plaintiff appealed to the Appeals Council (Tr. at 44), which found good cause for her tardy request and sent the case back for a hearing (Tr. at 47-48). On June 8, 2005, plaintiff

---

[5]Such requests must be filed within sixty days. Plaintiff filed her's 106 days after reconsideration was denied. (Tr. at 47.)

4

appeared pro se before ALJ Guy Fletcher.  (Tr. at 54-57, 494.)  The ALJ also summoned a vocational expert ("VE") and medical expert ("ME") to testify.  (Tr. at 494.)

**B.** **Hearing Testimony**

**1.** **Plaintiff's Testimony**

Plaintiff testified that she was nearly forty years old, 5'3" tall and weighed 213 pounds.  (Tr. at 499.)  She stated that she dropped out of school after the tenth grade, but that she had basic reading, writing and math skills.  (Tr. at 500.)  She said that she last worked three years previously as a mortgage lender, which required her to make and close loans and complete paperwork.  (Tr. at 500.)  Plaintiff stated that she left that job because she became mentally disabled and unable to focus.  Prior to that, plaintiff worked as a telemarketer.  (Tr. at 501.)  She stated that she left that job because of a breakdown.  She indicated that she had no other employment in the past fifteen years.  (Tr. at 502.)

Plaintiff testified that she was unable to work due constant pain, mental instability and debilitating headaches.  She stated that she took Neurontin for the pain and previously underwent therapy at a pain clinic, which was helpful.  (Tr. at 502.)  She described the pain as aching in the back, neck and legs, which was worse with humidity.  (Tr. at 503.)  She stated that the Neurontin lessened her pain but did not remove it.  (Tr. at 504.)  Without Neurontin, she described her pain as 8 on a 1-10 scale, 5 with the drug.  (Tr. at 505.)  She stated that her psychiatrist also prescribed Risperdal for her anxiety and feelings of helplessness, which helped.  She also testified that she took Methotrexate weekly for her psoriasis.  (Tr. at 511.)

5

Plaintiff stated that she could stand for about for about ten minutes, tried to avoid postural changes such as bending or stooping, and that she had to change positions while sitting. (Tr. at 505.) She said that the heaviest thing she could lift was a gallon of milk (Tr. at 506), and that she had difficulty climbing stairs (Tr. at 508). Plaintiff further testified that she had trouble concentrating, remembering and dealing with strangers or crowds. (Tr. at 506.)

Plaintiff testified that on a typical day she got up between seven and nine, had breakfast, watched the morning news, then did some dishes or other housework. She stated that housework was challenging, and she did less than she used to. She testified that her husband did most of the shopping and that he carried the laundry into the basement for her. (Tr. at 509.) Plaintiff said that she rarely went out because it was too difficult emotionally and mentally. (Tr. at 510.) Plaintiff testified that she went to the immediate care center about three times per week with severe headaches and would receive one or two Vicodin pills. (Tr. at 510.)

**2. ME Testimony**

The ME, Phillip Ruppert, a clinical psychologist, evaluated plaintiff under Listing 12.04, Affective Disorders, based on the evidence of major depression; Listing 12.07, Somatoform Disorders, based on evidence of psycho-physiological pain disorder; Listing 12.08, Personality Disorders, based on evidence of a personality disorder, not otherwise specified ("NOS"); and Listing 12.09, Substance Addiction Disorders, based on the evidence of abuse of opiates. (Tr. at 512-14.) Under the B criteria, Dr. Ruppert opined that plaintiff had mild to moderate restrictions in activities of daily living; moderate limitation in social functioning; and mild to moderate limitation in concentration, persistence and

6

pace. Under the fourth criteria, episodes of decompensation of extended duration, Dr. Ruppert noted one hospitalization, however, it was not of extended duration. (Tr. at 515-16.) Dr. Ruppert further opined that plaintiff would not have significant problems in learning, remembering and following simple instructions. (Tr. at 516.) However, he concluded that she should have only limited contact with co-workers and supervisors, and that she would have trouble with detailed and complex tasks, such as keeping track of mortgage documents. (Tr. at 517.)

### 3. VE Testimony

The VE testified that plaintiff's past job as a mortgage broker was sedentary, skilled work, and the telemarketing job was sedentary, semi-skilled work. (Tr. at 518.) The ALJ then asked a hypothetical question, assuming a person limited to light work[6] with the additional restriction of standing for no more than fifteen minutes at a time and no more than occasional crouching, bending and stooping, only a fair ability to deal with complex instructions, and limited interaction with the public. (Tr. at 519-20.) The VE testified that such a person could not perform plaintiff's past work, but could perform other jobs, such as general office clerk (6600 light and 6400 sedentary positions in Wisconsin), information clerk (300 light and 1000 sedentary), and office helper (6000 and 5000). (Tr. at 520.) The VE further stated that the office helper job would require little contact with co-workers; about half of the general office clerk jobs would have limited contact with others; and the information clerk may have more contact depending on the size of the office. The VE opined that employers of these types of jobs generally allowed one absence per month,

---

[6]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

7

and three breaks per day.  (Tr. at 521.)  Additional breaks for emotional or pain reasons would not be tolerated.  (Tr. at 522.)

## C.    Medical Evidence

### 1.    Treating Physicians

On January 3, 2002, plaintiff saw Dr. Douglas Horan regarding her psoriasis and received injections.  (Tr. at 321.)  She received additional injections on February 12 (Tr. at 320) and May 6 (Tr. at 314).

On March 8, 2002, plaintiff was seen at the Mercy Medical Center Emergency Room ("ER") complaining of back pain between the shoulder blades.  She was given Demerol and Phenergan, which provided relief.  A chest x-ray was normal, and Dr. Thomas Plank's impression was back muscle spasm.  (Tr. at 148-50.)

On May 9, plaintiff saw Dr. Paul Sumnicht complaining of irritable bowel, which she said had troubled her since 1986.  She had previously been treated with fiber and Lomotil. Her Lomotil was refilled and various tests ordered.  (Tr. at 312.)

Plaintiff returned to Dr. Horan for additional injections for her psoriasis on June 11. Dr. Horan also suggested Methotrexate for the condition and provided information.  (Tr. at 311.)  On July 3, Dr. Horan initiated the Methotrexate treatment.  (Tr. at 310.)

Plaintiff saw Dr. Charles Wernberg in the Mercy Immediate Care Department ("ICD") on July 15, 2002, complaining of a headache.  The doctor suspected the headache was secondary to the Methotrexate and suggested that she discuss it with Dr. Horan.  He also provided a prescription for Vicodin.  (Tr. at 308.)  On August 6, plaintiff told Dr. Horan that she had stopped the Methotrexate due to headaches but wanted to resume as it did help

8

during the time she used it. Dr. Horan also provided injections. (Tr. at 307.) Plaintiff returned to Dr. Horan on September 17, noting some improvement on Methotrexate. Dr. Horan provided Percocet for pain and suggested that she seek treatment for her headaches. (Tr. at 302.)

On September 13, 2002, plaintiff visited the Mercy ER, complaining of a headache. Dr. Charles Strancke diagnosed a situational tension headache and provided morphine sulfate and Ativan. Plaintiff was discharged with a prescription for Skelaxin and Vicodin. (Tr. at 151.) On October 8, plaintiff returned to the Mercy ER, again complaining of a tension headache. She was again provided morphine sulfate and Ativan, and discharged in improved condition with prescriptions for Skelaxin and Vicodin. (Tr. at 153-54.) On October 18, plaintiff visited the ICD complaining of a severe headache. She was provided Morphine and Ativan, with fair relief. (Tr. at 300.)

On October 21, 2002, plaintiff saw Dr. Rolando Espiritu to commence general medical care. She related a history of depression, hypothyroidism, asthma, migraines, psoriasis and irritable bowel syndrome. (Tr. at 297.) Plaintiff returned to Dr. Espiritu two days later complaining of a headache. She indicated that the previous night she called the covering doctor, who prescribed four Vicodin pills. Plaintiff was advised to see a psychologist and the pain clinic or a neurologist. (Tr. at 296.) Plaintiff called Dr. Espiritu on October 28 requesting referral to a neurologist for a CAT scan. Dr. Espiritu returned her call and indicated that, based on her symptoms, it was unlikely she had a tumor. (Tr. at 294.) In an October 31 note, Dr. Espiritu noted that plaintiff went to Theda Clark Medical Center and obtained a CAT scan, which was negative. (Tr. at 293.)

9

On November 9, 2002, plaintiff went to the ER with an anxiety attack following an argument with her husband and was provided Ativan. After an observation period, she calmed down and was discharged with instructions to take the Effexor prescribed by her psychiatrist daily. (Tr. at 155-56.)

On November 21, Dr. Bakhtiar Ansari, a neurologist, examined plaintiff. Plaintiff complained of worsening headaches over the previous five months, which did not respond to Imitrex but were controlled with Vicodin. (Tr. at 288.) Dr. Ansari's impression was that plaintiff suffered from chronic tension headaches, with a component of transform migraines and drug rebound headaches. (Tr. at 289.) He prescribed Depakote and Zomig and sent her for biofeedback therapy. He also recommended that she cut back on using Vicodin as much as possible. (Tr. at 289-90.)

On November 27, plaintiff was admitted to the Mercy Psychiatric Unit due to depression accompanied by suicidal ideation. (Tr. at 157.) Plaintiff noted that her mood plummeted following a change of medication about six weeks previously. She experienced recurrent suicidal ideation and frequent crying spells. (Tr. at 160.) She described stressors in her personal life, including behavioral issues with her son and the loss of a foster child to adoption. (Tr. at 161-62.) Her GAF on admission was 40.[7] (Tr. at 163.) Plaintiff's psychiatrist, Dr. Charles Morgan, started plaintiff on Lexapro and anticipated a short admission, perhaps three days. (Tr. at 163.) Plaintiff was discharged on November

---

[7]GAF stands for Global Assessment of Functioning. Set up on a 0-100 scale, a score of 40 reflects someone with a "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition 32-34 (2000) (hereafter "DSM-IV").

29, in significantly better condition with a GAF of 70.[8]  (Tr. at 158.)  Plaintiff returned to Dr. Morgan on December 13, 2002, and reported being on an upswing with fair energy and sleep.  (Tr. at 209.)

Plaintiff returned to Dr. Horan for a recheck of her psoriasis on December 11, 2002 and obtained injections.  Dr. Horan also increased her Methotrexate dosage.  (Tr. at 285.)

On January 9, 2003, plaintiff called Dr. Morgan's office and requested a refill of Vicodin.  Dr. Morgan refused the request.  (Tr. at 208.)  On January 13, plaintiff saw Dr. Jose Dias in the ICD complaining of a severe stress headache.  She stated that she usually used Vicodin but had run out.  She was provided Morphine, and her pain resolved.  She was discharged with a prescription for twenty Vicodin pills with no refills.  (Tr. at 283.)

On January 17, plaintiff returned to Dr. Morgan and discussed more problems with her son, and appeared sad and anxious.  (Tr. at 208.)  Later that month, plaintiff called requesting a refill of Vicodin, which Dr. Morgan called in.  (Tr. at 207.)  On February 5, plaintiff told Dr. Morgan she was going on vacation to Alabama for two weeks.  (Tr. at 207.)  On April 25, plaintiff told Dr. Morgan she was having problems going anywhere with crowds and stated that she needed a job.  (Tr. at 205.)  Plaintiff called on May 6 and requested an early refill of Klonopin, which Dr. Morgan provided.  She again called for a refill on May 23.  (Tr. at 203.)

On June 1, plaintiff returned to the Mercy ER complaining of headache.  She stated that she tried to contact Dr. Morgan for a refill of Vicodin, but he was unavailable and his

---

[8]This scores reflects someone with only mild symptoms or some difficulty in social or occupational functioning.  DSM-IV at 32-34.

colleague on call declined the refill. (Tr. at 164.) The ER doctor provided an injection of Toradol and Reglan, and discharged her with a prescription for Vicodin. (Tr. at 165.)

Plaintiff returned to Dr. Horan for a recheck of her psoriasis on June 3, 2003. Dr. Horan noted that she was "just about disabled because of her headaches and anxiety" and had "a lot of psoriasis." (Tr. at 281.) Dr. Horan provided injections and suggested a new medication. (Tr. at 281.) Dr. Horan provided further injections on June 10. (Tr. at 280.)

Plaintiff returned to Dr. Morgan on June 11 and reported that she was doing "so-so." (Tr. at 203.) She stated that she needed to go back to work or the family would have to file bankruptcy. (Tr. at 203.) Her mood was described as "sad, labile." (Tr. at 204.) On July 12, plaintiff called requesting a refill of OxyContin, and Dr. Morgan's colleague declined, suggesting that she contact her family physician, which she reluctantly agreed to do. (Tr. at 201.)

Plaintiff returned to Dr. Espiritu on June 16 and indicated that she had on her own increased her dosage of Synthroid when she learned that her thyroid level was sub-optimum. Dr. Espiritu admonished her not to increase her medication without notifying her doctor. However, he increased her dosage somewhat and encouraged her to exercise. (Tr. at 278-79.)

On June 17, plaintiff saw Dr. Horan for a recheck of her psoriasis and more injections. Dr. Horan again discussed with plaintiff her use of Vicodin and suggested that she resume Methotrexate. (Tr. at 275.)

On July 1, plaintiff saw Dr. Espiritu, indicating that she had been prescribed OxyContin by her psychiatrist, Dr. Morgan, had taken it twice per day rather than once as prescribed, and was running low. Plaintiff could not get a refill from Dr. Morgan and thus

12

came to Dr. Espiritu. Dr. Espiritu declined to prescribe OxyContin as she was supposed to take it only once per day, and he was leery of possible drug dependence. (Tr. at 272.) Plaintiff became upset and rushed out of the examining room, stating that she would not return to Dr. Espiritu. (Tr. at 273.) Dr. Espiritu also obtained a report from plaintiff's psychiatrist, which indicated a record of probable drug abuse, including notes from the pharmacy that she took more than recommended and requested early refills. (Tr. at 271.) On July 5, plaintiff went to the ER complaining of a headache, stating that she had run out of OxyContin and seeking a refill. (Tr. at 166.) She was provided Demerol and Vistaril, and a prescription for ten OxyContin pills. (Tr. at 167.) On July 15, plaintiff saw Dr. Jennifer Norden in the ICD, complaining of headache and muscle spasm around the left eye. Dr. Norden provided Demerol and Vistaril, and prescribed six Vicodin but instructed her to call Dr. Morgan and obtain narcotics through only one physician rather than emergency rooms and urgent care centers. (Tr. at 269.)

On August 5, 2003, plaintiff commenced treatment with Dr. Lars Swanson as her primary physician. Dr. Swanson noted plaintiff's conditions to be hypothyroidism, for which she took Synthroid; irritable bowel syndrome, well controlled on Lomotil; neck pain and spasm, for which he provided a sample of Ultracet; depression, which was treated by Dr. Morgan; and psoriasis, although he was unsure if she actually had psoriatic arthritis. (Tr. at 268.)

On August 11, plaintiff visited the ICD complaining of a headache. She stated that she used Vicodin prescribed by Dr. Morgan but had run out and had a rebound headache. Plaintiff was provided Toradol, without significant benefit, then Demerol and Vistaril, which relieved her symptoms. She was discharged with a prescription for Vicodin. (Tr. at 265.)

13

On August 19, plaintiff reported to Dr. Morgan that she was convinced she had fibromyalgia, stating "it all fits." She further stated that the family was having financial problems and that she may apply for disability. (Tr. at 199.)

On September 4, Dr. Randall Schultz evaluated plaintiff at the behest of Dr. Swanson regarding an out-patient pain management program. Plaintiff complained of neck pain and headaches, worse with stress. Dr. Schultz noted that plaintiff had a history of hyperthyroidism,[9] irritable bowel symptoms, depression for seven years, as well as psoriasis, with her chiropractor telling her that she had psoriatic arthritis. Dr. Schultz wrote that "though she feels she has fibromyalgia . . . it appears that this is more of a diagnosis that [Dr. Swanson] suggested she may have and she has taken this label and run with it so to speak." (Tr. at 169.) Dr. Schultz's impression was that plaintiff's underlying psychological tension was manifesting itself in pain and intensification of physical symptoms. "Clearly there seems to be an interaction between her physical and psychological state and it is unlikely she is experiencing a true structural abnormality accounting for her symptoms and I would venture to say that she is not experiencing true migraine headaches." (Tr. at 170.) Dr. Schultz recommended that plaintiff receive mental health treatment, that she discontinue opiate analgesics, and that she work with biofeedback and psychology within the pain management program to learn relaxation techniques. (Tr. at 171.)

Plaintiff returned to Dr. Swanson on September 8, 2003, stating that Dr. Morgan would no longer prescribe Vicodin. Dr. Swanson noted that he had conferred with Dr.

---

[9]This appears to be a typographical error, as the other records indicate that plaintiff had hypothyroidism.

14

Schultz at the pain clinic, who believed that plaintiff's pain was psychosomatic and manifesting itself in headaches. Plaintiff indicated that she used Vicodin to sedate herself so she would not feel the pain anymore. Dr. Swanson agreed to prescribe Vicodin but with conditions: use of no more than one tablet every four to six hours as a rescue medicine when she had an extreme headache; if she needed to take more than that, she was to report to the ER to be monitored. He prescribed forty-five pills; if she used more within one month he would not refill the prescription. (Tr. at 262.)

On September 16, plaintiff underwent a hysterectomy. (Tr. at 174-75.) On September 22, plaintiff returned to the hospital complaining of suprapubic pain. Tests were normal, and Dr. Paul Boeder assessed plaintiff with typical post-operative pain. Plaintiff admitted to struggling with pain control secondary to her long standing narcotic use. She was provided Toradol.[10] (Tr. at 261.) On September 28, plaintiff visited the Mercy ER complaining of headaches. She was provided Demerol and Phenergan and discharged in good condition with a prescription for Vicodin. (Tr. at 180.)

On September 30, plaintiff saw Dr. Morgan, discussing further problems with her son and stating that Dr. Swanson had taken over her medication and limited her use of Vicodin. (Tr. at 197.) On October 9, plaintiff returned to Dr. Morgan and was depressed and labile. (Tr. at 195-96.)

Plaintiff also saw Dr. Swanson on October 9, requesting a referral to rheumatology for evaluation of possible fibromyalgia and an early refill of her Vicodin. Plaintiff stated that she planned on filing for disability and believed that a diagnosis from a rheumatologist

---

[10]Plaintiff returned to Dr. Boeder for a post-operative exam on October 13 and was doing well without complaints. (Tr. at 257.)

would be helpful. She stated that Dr. Swanson had previously provided her with a handout about fibromyalgia, and that she felt she had every one of the symptoms of the disease. (Tr. at 258.) Dr. Swanson provided the referral and agreed to provide a refill of Vicodin a little early due to her recent hysterectomy, but stated that he would not do so again. (Tr. at 259.)

Plaintiff also went to the Mercy ER on October 9 complaining of muscle spasms in the left frontal forehead. Dr. Michael Finger provided Demerol and Phenergan, which seemed to help. Dr. Finger discharged plaintiff with a prescription for Vicodin. (Tr. at 210.) After she left, plaintiff's pharmacist called and stated that plaintiff had just received a prescription for Vicodin. Dr. Finger wrote: "At this point I would question the patient's actions and have to consider drug seeking behavior as a[n] adjunct diagnosis." (Tr. at 211.)

On October 17, rheumatologist Dr. Stefan Monev evaluated plaintiff at Dr. Swanson's request. On examination, he noted multiple trigger, tender points, as well as extensive psoriasis, including on the soles of both feet. His impression was that plaintiff had fibromyalgia, neck pain and psoriasis. (Tr. at 213.) However, he found no evidence of psoriatic arthritis. He recommended various tests, an x-ray of the cervical spine, mild to moderate aerobic exercise and follow-up with her primary care physician. He stated that in his experience opioid-containing pain medications did not contribute to the management of fibromyalgia. (Tr. at 214.) The X-ray was taken the same day and was negative. (Tr. at 215.)

Plaintiff also visited the ICD on October 17, complaining of a headache. She stated that she obtained Vicodin from Dr. Swanson, but thirty of her forty-five pills had been stolen

16

from her purse, and she could not get a refill because the month was not up. Dr. Dias noted that plaintiff appeared to be in pain, but he could not tell if it was real pain or an act. He stated that in reviewing her chart there were questions of drug seeking behavior. Dr. Dias provided Demerol and Phenergan, which relieved her symptoms, and discharged her with samples of Panlor. (Tr. at 255.)

Plaintiff again visited the ICD on October 20 complaining of muscle spasm around the left eye. She stated that she usually used Vicodin but had run out. She was provided Demerol and Phenergan. (Tr. at 253.) Plaintiff returned to Dr. Swanson the following day, stating that she had been forced to visit the emergency department because some of her Vicodin were stolen, and requesting a refill. (Tr. at 251.) Dr. Swanson refused to refill her Vicodin prescription early and noted that she was to meet with Dr. Schulz to discuss a pain management treatment plan. (Tr. at 252.)[11]

---

[11]Plaintiff enrolled in the pain management treatment program on October 17, 2003. She was scheduled for twice weekly occupational therapy for ten sessions to address muscle relaxation, stretching, relaxation techniques and a home exercise program. She was also to see psychology (Dr. Henke) once weekly for eight to ten sessions for supportive therapy, relaxation training, cognitive behavioral therapy, activity management and pain management. It was determined that physical therapy was not indicated. (Tr. at 353-55.) A December 17 summary indicated that plaintiff made some progress (Tr. at 351-52), as did the January 15, 2004 update, although plaintiff had missed two of five psychological sessions (Tr. at 349-50). On February 5, 2004, Lisa Veregge, RN, indicated that plaintiff had made further progress, despite cancelling three of nine psychology sessions. (Tr. at 347-48.) On February 26, 2004, Sarah Troxell, RN, indicated that goals in the areas of relaxation and pacing were partially met. Plaintiff had cancelled five of twenty-one occupational therapy sessions and four of twelve psychology sessions. (Tr. at 345.) Plaintiff's treatment plan was modified to include additional occupational therapy and psychology sessions. (Tr. at 346.) There appear to be no further records on the pain management program.

17

Plaintiff returned to Dr. Horan for a recheck of her psoriasis on October 24 and had lesions on her nose, ear lobes, fingers, hands and elbows. Dr. Horan provided injections and discussed resuming Methotrexate. (Tr. at 250.)

In a psychiatric questionnaire completed on November 11, 2003, Dr. Morgan wrote that he had treated plaintiff for about one year and saw her monthly. His listed her diagnosis as major depression with anxiety. He noted that her long term memory was intact, but that she had very mild impairment of short term memory. He indicated that she had no problems with thought processes or hallucinations. (Tr. at 217.) He stated that she experienced mild agitation, present intermittently, had trouble sleeping, and had episodes of shortness of breath and paroxysm of weeping. He wrote that she did some housework but generally seemed unproductive in normal activities of daily living. (Tr. at 218.) He stated that her ability to relate to others was mildly impaired. He indicated that she had been hospitalized in November 2002. He stated that she had been treated with drugs and therapy with very limited response. However, he wrote that her ability to understand, remember and carry out instructions was intact, as was her ability to respond appropriately to supervisors, co-workers and routine work pressures and changes. (Tr. at 219.)

On November 17, 2003, plaintiff returned to Dr. Swanson again requesting an early refill of Vicodin. She stated that the forty-five pills provided two weeks earlier were gone and that she had been forced to go to the ER. She also stated that she was to start in a pain management program the next day. Dr. Swanson refilled the Vicodin, with reservation, noting that she was using the medication too often and needed to work on other strategies for dealing with pain and psycho-social stressors. (Tr. at 248.)

18

On November 26, plaintiff visited the Mercy ER complaining of muscle spasm in the forehead. She was provided Dilaudid and Vistaril, and discharged with a prescription for Vicodin. (Tr. at 238-39.) She again went to the ER on December 15, stating that on the way back from visiting friends in Minnesota she developed severe frontalis muscle spasticity, which required her to stop at an ER in Mauston, where she was provided with Toradol. She stated that the treatment did not help. Dr. Strancke provided various medications, which seemed to help, and she was discharged home. (Tr. at 240-41.) Plaintiff returned to the ER on December 19, complaining of continued headache since December 15. Dr. Bruce Harvey noted that plaintiff had been prescribed ninety-six Vicodin in December alone, yet stated she was out of the drug. (Tr. at 243.) Dr. Harvey advised plaintiff that it was inappropriate for her to keep returning to the ER for narcotics and refused to provide same. He offered her Toradol, about which she was displeased. She asked to see another physician, and Dr. Jay Muller concurred that plaintiff was receiving inappropriate narcotics through the ER. (Tr. at 244, 245.) Dr. Harvey's diagnosis was cephalgia[12] and drug seeking behavior. (Tr. at 244.)

On December 23, 2003, Dr. Swanson saw plaintiff to obtain a pain medication contract. Dr. Swanson reviewed the ER records of Drs. Stranke, Harvey and Muller, and had plaintiff agree to obtain narcotics only from his office. He provided her with a one month prescription for Vicodin, 180 pills, with no refills. He further notified the ER and ICD of the contract, and sought further recommendations from Dr. Henke on how to better manage pain without narcotics. (Tr. at 246.)

---

[12]Cephalgia is a headache. Stedman's Medical Dictionary 347 (28th ed. 2006).

On January 23, 2004, plaintiff returned to Dr. Swanson, requesting more pain medication. Dr. Swanson spoke to Dr. Henke about plaintiff's progress in the pain management program, and Dr. Henke said that plaintiff was improving but her attendance was sporadic. Dr. Swanson refused to provide plaintiff with any more narcotics and told her she would need to plan better and use the strategies she learned in the pain clinic. He did offer her Xanax and Neurontin, which she accepted. (Tr. at 464-65.)

Plaintiff was brought by police to the Mercy ER on February 7, 2004 based on threats of self-harm. (Tr. at 332). On admission to the ER, she stated that she "just had a bad day and was very stressed and emotional." (Tr. at 332.) On examination, she was alert, oriented and cooperative. (Tr. at 332.) Based on her suicide threat, plaintiff was admitted to the psychiatric unit. (Tr. at 328, 333.) Dr. Morgan's February 7 exam note indicated that plaintiff's husband had been on active naval reserve duty in Illinois, and she found herself overwhelmed by problems at home, including with her son and the snow. During a telephone conversation with her husband, she threatened suicide, which caused him to call the police, who came and took her into protective custody. Plaintiff's husband also obtained leave and rushed home. When Dr. Morgan spoke to her, she stated that, "I was overwhelmed; it was just stupid stuff!" (Tr. at 334.) She denied that she was suicidal or would hurt herself. (Tr. at 334.) On mental status exam, plaintiff was somewhat labile and tended to minimize recent circumstances. She was fully oriented and admitted being depressed. There was no evidence of psychosis and her cognitive functions were intact. Her speech was fluent, organized and responsive. Dr. Morgan found her "rather dependent" and "somewhat manipulative." (Tr. at 335.) Her judgment and insight were limited. (Tr. at 335.) He assessed her with depression, NOS, and personality disorder,

20

NOS, with a GAF of 50-60.[13]  (Tr. at 336.)  Dr. Morgan told her that the circumstances of her admission were most serious and could not be taken lightly.  He further told her that she would be staying in the hospital at least for the next day so she could contemplate these matters and consider more appropriate coping methods.  (Tr. at 337.)

When Dr. Morgan examined plaintiff on February 8, he found her to be quite labile, but fully oriented, with intact cognitive functions and fluent, organized and responsive speech.  She was treated with pharmacotherapy and psychotherapy, and discharged on February 9 with no further suicidal ideation and a GAF of 70.  (Tr. at 328-29.)  She had the ability to attend to task for one hour and follow two to three step directions without difficulty. (Tr. at 330.)

On February 14, plaintiff went to Mercy ER complaining of rib pain after an episode of crying.  X-rays came back normal (Tr. at 344), and she was diagnosed with an intercostal muscle strain and provided Toradol (Tr. at 342).  On February 15, plaintiff visited the ICD  complaining of right rib pain.  She stated that she did not want to use up the Vicodin Dr. Swanson prescribed and jeopardize her contract with him.  Dr. Thomas Wex initially prescribed Vicodin but cancelled the prescription when the pharmacy notified him of Dr. Swanson's restriction.  Dr. Wex provided Ultracet and suggested that she use her Vicodin and explain the situation to Dr. Swanson.  (Tr. at 462.)  On February 16, plaintiff saw Dr. Swanson, who stated that he had given her permission to use Vicodin for her chest wall pain.  After discussing the matter with Dr. Henke, Dr. Swanson agreed to give plaintiff thirty additional Vicodin for chest wall pain.  (Tr. at 460.)

---

[13]This score reflects someone with a serious impairment in functioning.  DSM-IV at 32-34.

On March 9, 2004, plaintiff returned to Dr. Horan for a recheck of her psoriasis and received injections. She also agreed to resume Methotrexate. (Tr. at 459.) By April 13, she noted some improvement. (Tr. at 455.)

On May 1, plaintiff saw Dr. Paul Sumnicht complaining of headache and back pain. She had apparently run out of Vicodin. Dr. Sumnicht instructed plaintiff on visualization to relieve anxiety and refused to refill her Vicodin. Plaintiff declined a refill of Flexeril or Skelaxin. (Tr. at 452.) Plaintiff returned to Dr. Swanson on May 3 to request an early refill of Vicodin. She stated that she had used 160 Vicodin tablets since April 16 due to an onset of back pain, in addition to her headaches. Dr. Swanson agreed to provide her with ten additional Vicodin tablets. (Tr. at 450.)

On May 20, plaintiff returned to Dr. Horan complaining of psoriatic pain in her feet after having been to a "foot party." Her psoriasis was otherwise doing well on Methotrexate. Dr. Horan recommended a short course of prednisone and provided Percocet for the pain. (Tr. at 448.)

On May 27, plaintiff saw Dr. Swanson, stating that her current supply of Vicodin was out, that the Percocet Dr. Horan provided work well, and asking for Percocet. Dr. Swanson indicated that by obtaining narcotics from another doctor, plaintiff had breached their contract. Dr. Swanson told plaintiff that he would not provide her with Percocet but would overlook the violation of the contract if plaintiff did not seek further narcotics from another provider in the two weeks until her next refill. (Tr. at 442.)

On June 4, plaintiff visited the ICD complaining of a headache. She stated that she went to the ER the previous night and received Toradol and Vistaril, with only temporary relief. She also said that she had gone through her 150-pill monthly supply of Vicodin in

two weeks due to stress at home. Dr. Smrecek provided Demerol but declined to provide any pain pills. (Tr. at 440.) Plaintiff again visited the ICD on June 7 complaining of headache pain and was again provided Demerol and Vistaril. (Tr. at 439.) She returned later the same day, and Dr. Smrecek provided more Demerol and Vistaril. (Tr. at 437.)

On June 20, plaintiff saw Dr. Smrecek for an infection of her feet and stated that she might need some extra pain medication. Dr. Smrecek declined to provide pills and suggested that she continue soaking her feet and use Clobetasol. (Tr. at 435.)

On June 29, plaintiff returned to Dr. Swanson complaining of left hip pain following a fall. Dr. Swanson proposed treating the pain with ibuprofen and commended plaintiff for not using Vicodin. (Tr. at 434.)

Plaintiff saw Dr. Christopher Rocke for back spasm on July 7. He provided Carisoprodol and advised her to follow up with Dr. Swanson. (Tr. at 431.)

Plaintiff returned to Dr. Horan for a recheck of her psoriasis on July 13 and was doing well everywhere but on the feet. She was able to walk in tennis shoes and socks but had difficulty wearing sandals. Dr. Horan recommended that she continue on Methotrexate and use Clobetasol ointment twice daily. (Tr. at 428.)

On July 20, plaintiff returned to Dr. Swanson requesting an early refill of Vicodin. She stated that she had used 140 tablets in the past ten days to treat her headaches. Dr. Swanson spoke to Dr. Henke, who stated that plaintiff's attendance at the pain clinic had been sporadic. Dr. Swanson declined to refill the Vicodin but did provide her with Soma. (Tr. at 426.)

23

On July 22, plaintiff visited the ICD complaining of severe headache. She stated that she was about to leave on a trip and had no pain medication. Dr. Smrecek provided Demerol and Vistaril and forty Vicodin tablets. (Tr. at 425.)

On August 2, 2004, plaintiff returned to Dr. Swanson again requesting a medication refill. Dr. Swanson told plaintiff that her obtaining of forty Vicodin tablets from the ICD was a violation of their contract and informed her that based on her breach, as well as her frequent and persistent calls to the nursing staff requesting refills, that he was terminating her as a patient based on drug seeking behavior and non-compliance. (Tr. at 423.) Later that day plaintiff went to the ICD complaining of a headache and requesting pain medication. She was given Demerol and Phenergan, which did not help, then Toradol, which did. She was discharged with thirty Percocet tablets. (Tr. at 422.)

On August 18, plaintiff saw Dr. Matthew Kraemer to establish primary care. Dr. Kraemer noted that a review of plaintiff's chart showed a definite dependency on narcotics of large quantities, with frequent requests for early refills, which made him suspicious of what may be happening with all of the pills. (Tr. at 419.) Dr. Kraemer told plaintiff that based on her history, he was unwilling to manage her pain medications. He did renew her Synthroid. (Tr. at 420.) On August 24, plaintiff went to the ICD complaining of muscle spasm in her forehead. Dr. Wex administered Demerol and Phenergan, and gave her a prescription for thirty Vicodin pills. (Tr. at 417.)

On August 27, plaintiff saw Dr. Alejandro Eisma requesting pain medication renewal. Dr. Eisma told her to contact Dr. Morgan for evaluation of a detox program to get off the Vicodin, as she was most likely dependent on it. In the meantime, he gave her Darvocet for pain. (Tr. at 415.)

24

On September 28, plaintiff returned to Dr. Horan with additional psoriasis papules on her fingers, hands and elbows. She stated that she had experienced a flare-up due to stress related to her daughter's upcoming wedding. Dr. Horan provided injections. (Tr. at 414.)

On October 8, plaintiff visited the ICD complaining of chest pain while she was stretching, which later moved to her back. On examination, plaintiff was hunched over and reluctant to move, but was able to move without much difficulty. Plaintiff requested narcotic pain medication, but Dr. Smrecek indicated that she had to get such through her primary care physician, Dr. Kraemer, or her psychiatrist, Dr. Morgan. (Tr. at 412.)

On October 15, plaintiff saw Dr. Edwin Wilson complaining of back pain following a car accident. Dr. Wilson gave her ten Vicodin pills but stated that she would need to see her regular physician for any more. (Tr. at 410.) An x-ray of the lumbar spine was normal. (Tr. at 409.) On October 21, plaintiff returned to the ICD about her back pain, and Dr. Wex suggested heat and ibuprofen, and prescribed twenty Vicodin pills with no refill. (Tr. at 405.)

Plaintiff called Dr. Kraemer on October 25 requesting more narcotics for her back pain. Dr. Kraemer indicated that plaintiff had called on October 22 requesting more pills, as the ICD had refused and she could not obtain a refill from Dr. Morgan until October 26. Dr. Kraemer had agreed to give her ten Hydrocodone on October 22. Dr. Kraemer learned that on Sunday, October 24, plaintiff had called the hospitalist on call at Mercy, Dr. Haynes, requesting even more pills, as she had used up what Dr. Kraemer had given her in less than two days. Dr. Haynes checked her chart, noting her previous issues with narcotics, and declined. Plaintiff then went to the ER and obtained Hydrocodone. Dr. Kraemer

25

indicated that he had not evaluated plaintiff for this problem and that he would not provide a refill.  He further noted that plaintiff had been persistently calling his office and had become belligerent with his nurse.  She was to follow up with Dr. Morgan in two days for medication refill.  (Tr. at 402-03.)

On December 22, 2004, plaintiff saw Dr. Kraemer, requesting pain medication for continued back pain related to the accident.  Dr. Kraemer questioned plaintiff, given her history and her receipt of eighteen Darvocet pills from Dr. Eisma on November 19 for headaches.  Dr. Kraemer advised plaintiff that he wanted her to follow a more conservative method of treatment, as she was about two months post-accident and had been receiving appropriate care (including chiropractic treatment).  Dr. Kraemer advised plaintiff to continue seeing the chiropractor and provided twelve Darvocet with no refill.  (Tr. at 403.)

On December 28, plaintiff saw Dr. Eisma complaining of continued low back pain and requesting a refill of pain medication.  On examination, plaintiff had tenderness of the left lumbar area and mild limitation of motion.  She was provided a prescription for twelve Darvocet tablets.  (Tr. at 401.)

On December 29, plaintiff went to the ICD complaining of headache and spasms in the forehead area.  Plaintiff stated that she had not refilled her pain medications since October 20.  Dr. Smrecek provided twenty Hydrocodone pills.  (Tr. at 400.)

On January 2, 2005, plaintiff again visited the ICD complaining of headache. Plaintiff stated that she had been seen in the ER the previous day and received a Lidocaine patch and shot of Toradol, without relief.  She was provided Demerol and a prescription for fifteen Hydrocodone.  (Tr. at 399.)  On January 4, plaintiff again visited the ICD complaining of headache and was provided with Demerol and a prescription for

26

Hydrocodone to last her until she could receive an injection. (Tr. at 398.) Plaintiff returned on January 10 and continued to have pain, despite receiving a steroid injection into the left eyebrow the previous week. She stated that she had been to the ER twice over the weekend and received injections of Demerol but no Hydrocodone. She also stated that she did not go to Dr. Kraemer because he would not give her narcotics. She further stated that she was entering the Methadone clinic the next day.[14] Dr. Dias provided an injection of Demerol and a prescription for twenty Hydrocodone. (Tr. at 395.)

On February 18, plaintiff saw Dr. Smrecek at the ICD complaining of headache. She stated that she had been doing well and off pain pills for the past five weeks, but the pain had returned. Dr. Smrecek provided Demerol and Vistaril, and a prescription for twenty Hydrocodone. (Tr. at 393.)

On March 10, plaintiff returned to the ICD complaining of muscle spasms in the forehead. Dr. Wex provided a prescription for Vicodin and directed her to contact her primary care physician for further medication. (Tr. at 392.) She came again to the ICD on March 14 with another headache, and Dr. Dias gave her Demerol, which helped, and a prescription for Hydrocodone. (Tr. at 391.)

On March 22, plaintiff returned to Dr. Horan for injections of her psoriasis. She had fairly severe sole and palm involvement but had been using Methotrexate sporadically. Dr. Horan stated that she could not "dabble" in terms of taking Methotrexate a little bit now and then. He also prescribed Dovonex ointment and renewed her prescription for Percocet. (Tr. at 389.)

---

[14]It appears that she did not go. (Tr. at 476.)

On March 24, plaintiff visited the ICD complaining of a headache. Plaintiff indicated that she had been seeing a dentist who felt that her headaches may be related to bruxism.[15] Dr. Wex provided a prescription for Vicodin and told her to follow up with her primary care physician. (Tr. at 492.)

Plaintiff returned to the ICD on March 26, continuing to complaint of headache. Dr. Wex provided more Vicodin and again told her to follow up with her regular doctor. He also gave her a list of doctors if she did not feel comfortable with her current physician. (Tr. at 490.)

Plaintiff saw Dr. Dias at the ICD on April 8, with another headache. She was given Toradol and discharged home. (Tr. at 489.) She returned on April 15 and stated that she had run out of the Vicodin provided by her dentist. She declined an injection of Demerol but asked for more Vicodin, which Dr. Dias provided. (Tr. at 488.) She returned again on April 20, and Dr. Dias asked plaintiff why she did not follow up with her primary doctor. She stated that "they tell her to always come to the urgent care because they will not give her anything for her headaches." (Tr. at 486.) Dr. Dias gave her fifteen more Vicodin but told her she had to follow up with Dr. Kraemer. (Tr. at 485.)

On May 9, plaintiff saw Dr. Smrecek at the ICD with a headache. He gave her two Vicodin pills and told her that it was inappropriate for her to come there when she was working with others on her headaches and pain. (Tr. at 484.)

On May 12, plaintiff saw Dr. Cindy Bae Catania at the ICD, complaining of a headache. Plaintiff stated that only Vicodin helped and asked for a refill. She further

---

[15]Bruxism is a clenching of the teeth, usually during sleep. Stedman's Medical Dictionary 273-74 (28th ed. 2006).

28

stated that Dr. Kraemer would not see her and that she was starting with a new primary physician, Dr. Kavan, but wanted pain medication until then. Dr. Catania stated that plaintiff was "very strangely noncooperative during the exam." (Tr. at 482.) Dr. Catania provided a shot of Toradol, and plaintiff became angry twenty minutes later, stating that it was not helping. Dr. Catania's assessment was chronic headache with questionable drug seeking behavior. Dr. Catania told plaintiff that she should not be coming to urgent care for narcotics and that narcotics were inappropriate for headache management, especially in light of the fact that she had not tried anything else. Plaintiff became very agitated, and Dr. Catania agreed to provide ten Vicodin tablets, with refills only from a primary physician. (Tr. at 482.) Three days later she got more Vicodin from Dr. Wex at the ICD. (Tr. at 480.)

On May 18, plaintiff saw Dr. Joel Kavan to establish primary care. Dr. Kavan reviewed plaintiff's history and conducted an exam. Plaintiff believed that her headaches were related to TMJ[16] problems but was nevertheless chewing gum. Dr. Kavan made a referral to a TMJ clinic and told plaintiff that he would not prescribe narcotics. He increased her dose of Neurontin and discussed use of Topamax. For pain, she was to use ibuprofen and cyclobenzaprine. (Tr. at 476-79.) The next day, plaintiff went to the ICD and obtained Hydrocodone for TMJ pain. (Tr. at 475.)

On May 24, plaintiff returned to the ICD complaining of headache. She had not made an appointment with the TMJ clinic as Dr. Kavan suggested, stating that she did not think her insurance would cover it. Dr. Kavan had also refused to provide her with narcotics. Dr. Dias had a long discussion with plaintiff about obtaining narcotics in the

---

[16]TMJ stands for temporomandibular joint. Stedman's Medical Dictionary 1994 (28th ed. 2006).

29

immediate care, but agreed to provide her with twenty Vicodin "this one time." (Tr. at 473.) On May 31, Dr. Dias provided ten more Vicodin based on the fact that defendant had obtained an appointment with Dr. Bergstrom in the TMJ clinic. (Tr. at 472.)

On June 7, plaintiff returned to Dr. Dias and stated that Dr. Bergstrom believed she had some TMJ dysfunction but did not believe it should be treated with narcotics. Dr. Dias told plaintiff that she needed to reach an agreement with her primary doctor on a narcotics contract to treat her pain during therapy and slowly wean her off. He gave her five Vicodin until she saw Dr. Kavan the next day. (Tr. at 470.)

On June 8, plaintiff saw Dr. Kavan, who noted that the TMJ specialist recommended Feldene and physical therapy. Plaintiff inquired about a medication contract and stated that she wanted to get off Vicodin. Dr. Kavan agreed to be the sole pain medication provider until she got through therapy, gradually tapering off the next two months, with medication to terminate if she did not follow through with therapy. He provided fifteen Vicodin, which was to last her one week. Dr. Kavan believed plaintiff to be sincere about wanting to get off Vicodin. (Tr. at 468.)

On July 4, plaintiff called the on-call physician, stating that she had done quite a bit of walking the previous day in sandals, which caused a psoriasis flare-up. She stated that Vicodin was the only thing that helped, and Dr. Thomas Chulski provided a prescription. (Tr. at 467.)

### 2.    SSA Consultants

On November 17, 2003, Keith Bauer, PhD, completed a Psychiatric Review Technique form for the SSA, indicating that plaintiff suffered from an Affective Disorder under Listing 12.04, based her history of depression. (Tr. at 220, 223.) Under the B

30

criteria, he found moderate restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence and pace; and no episodes of decompensation of extended duration. (Tr. at 230.) In an accompanying mental RFC assessment, Dr. Bauer found that plaintiff was not significantly limited in eighteen of twenty categories, but was moderately impaired in her ability to complete a normal workday without interruptions or breaks based on psychological symptoms and in her ability to set realistic goals or make plans independently of others. (Tr. at 234-35.)

On March 23, 2004, Jack Spear, PhD, completed a Psychiatric Review Technique form for the SSA, evaluating her under Listing 12.04, Affective Disorders, based on evidence of depression; and Listing 12.07, Somatoform Disoder, based on evidence of psycho-genic pain disorder. (Tr. at 361-67) Under the B criteria, he found moderate limitation in activities of daily living and in concentration, persistence and pace, and mild limitations of social functioning, with no episodes of decompensation of extended duration. (Tr. at 371.) In a mental RFC assessment, he found that plaintiff was moderately limited in her ability to remember and carry out detailed instructions, maintain attention for extended periods, work at a consistent pace without interruptions from symptoms, and deal with supervisors and changes in the work setting. He found her not significantly limited in all other areas. (Tr. at 375-76.) He concluded that she could perform simple, routine, low stress work within her physical limitations. (Tr. at 377.)

On November 18, 2003, Dr. Pat Chan completed a physical RFC assessment for the SSA, in which he opined that plaintiff could perform light work, with no other limitations. (Tr. at 379-86.) On March 24, 2004, Dr. Michael Baumblatt affirmed that assessment. (Tr. at 386.)

31

## D.    ALJ's Decision

On August 11, 2005, the ALJ issued an unfavorable decision.  The ALJ first noted that plaintiff's work history was somewhat limited, and that she engaged in SGA in only about four of the previous fifteen years.  (Tr. at 13.)  The ALJ further noted that plaintiff alleged an onset of disability on October 4, 2002, and that she was insured for disability benefits only through December 31, 2003,[17] meaning that she had to establish disability between those dates.  (Tr. at 14.)

The ALJ then reviewed the medical evidence and applied the five-step evaluative procedure.  He concluded that plaintiff had not engaged in SGA since her alleged onset date and that she had severe impairments, including headaches, musculo-skeletal complaints probably consistent with fibromyalgia, psoriasis, and a history of depression and anxiety.  (Tr. at 18-19.)  However, he concluded that none of these impairments met or equaled a Listing.  The ALJ stated that plaintiff's psoriasis and hypothyroidism were mild and controlled with treatment.  He noted that plaintiff underwent a hysterectomy, which may have incapacitated her for a month or two, but no longer.  He further considered plaintiff's history of depression, but noted that such condition had not prevented plaintiff from working in the past.  Regarding her two psychiatric hospitalizations, the ALJ noted that both were brief and that she was discharged with a GAF of 70, suggesting that she was functional, and that treatment with Dr. Morgan had been intermittent.  Regarding plaintiff's

---

[17]A claimant may obtain DIB only if she becomes disabled while in "insured status." Generally, to have insured status, a claimant must have earned a certain minimum amount in wages or self-employment income for at least twenty quarters in the forty-quarter period immediately prior to the date of disability.  See Chapman v. Apfel, 236 F.3d 480, 482 (9th Cir. 2000) (citing 20 C.F.R. § 404.130(b)(2)).

32

headache complaints, the ALJ noted that plaintiff's neurological work up was negative, migraines were ruled out by several doctors, and that drug rebound might be a factor.

The ALJ also found that plaintiff engaged in drug seeking behavior, noting that plaintiff used various conditions as an excuse to get Vicodin, and that Dr. Swanson eventually terminated his treatment relationship with plaintiff based on her conduct. The ALJ further noted that the examining rheumatologist stated that narcotics were not the way to treat plaintiff's fibromyalgia. The ALJ concluded that plaintiff's "primary problem is substance abuse." (Tr. at 19.)

The ALJ questioned whether plaintiff had significant physical problems, noting the lack of evidence of psoriatic arthritis and the limited mention of fibromyalgia in the records. The ALJ thus believed that the SSA physical consultants' limitation to light work may be an underestimate. However, giving her the benefit of the doubt, the ALJ found that plaintiff retained the RFC for light work, with no prolonged standing or walking, and only occasional crouching, bending and stooping. The ALJ noted that one of the SSA mental health consultants concluded that plaintiff could perform her past, skilled work. However, again giving plaintiff the benefit of the doubt, the ALJ adopted the opinion of the other consultant and the ME, and further limited plaintiff to unskilled work with limited interaction with the public. (Tr. at 20.) The ALJ found plaintiff's allegations of greater limitations not credible, based on the evidence of drug seeking behavior and the lack of medical support for her claims. (Tr. at 22.)

Given this RFC, the ALJ accepted that plaintiff could not perform her past, skilled work. (Tr. at 20.) However, relying on the testimony of the VE, the ALJ concluded that plaintiff could perform other jobs, including general office clerk, information clerk and office

33

helper. (Tr. at 21.) The ALJ therefore concluded that plaintiff was not disabled and denied her claim. (Tr. at 22.)

Plaintiff sought review of the ALJ's decision, but on February 1, 2006, the Appeals Council denied her request. (Tr. at 5.) The present action followed.

### III.  DISCUSSION

Plaintiff argues that the ALJ erred in (1) evaluating the credibility of her allegations, (2) setting RFC and (3) questioning the VE. I address each argument in turn.

### A.    Credibility

Plaintiff first argues that the ALJ erred in evaluating the credibility of her testimony and the evidence of her disabling conditions. While the district court must generally defer to the ALJ's credibility determination, Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004), reversing only if it is "patently wrong," Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003), the ALJ must comply with SSR 96-7p in reaching that determination, Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).

SSR 96-7p establishes a two step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. SSR 96-7p. Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms is established, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms to

determine the extent to which the symptoms limit her ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not fully substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. Relevant factors include the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must provide specific reasons for his determination, supported by the evidence in the case record. SSR 96-7p.

Finally, in considering whether the record supports the claimant's assertions, the ALJ must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Windus, 345 F. Supp. 2d at 946. While this does not mean that the ALJ has to discuss in writing every piece of evidence in the record, he must provide at least a glimpse into his reasoning. Zurawski v. Halter, 245 F.3d 881, 889 (7th Cir. 2001).

### 1.     Drug Seeking Behavior

Plaintiff first contends that the ALJ relied on her substance abuse and drug seeking behavior without complying with 20 C.F.R. § 404.1535. Under the Social Security Act, an individual cannot be considered disabled if substance abuse is a "contributing factor." 42 U.S.C. § 423(d)(2)(C). Section 404.1535(b)(1) explains that the question for the ALJ in such a circumstance is whether the claimant would still be disabled were she not a

35

substance abuser. <u>Kangail v. Barnhart</u>, 454 F.3d 627, 628 (7th Cir. 2006). Plaintiff argues that the ALJ found her not credible because her primary problem was substance abuse without evaluating whether her use of Vicodin and other narcotics was a contributing factor in the determination of disability. The problem with this argument is that the ALJ found plaintiff <u>not</u> disabled, <u>despite</u> her substance abuse. Thus, there was no need for him to decide whether substance abuse was a contributing factor.[18]

Plaintiff next argues that by finding that her primary problem was substance abuse, the ALJ substituted his opinion for that of a medical expert. <u>See</u> <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). I disagree. The ALJ's conclusion that plaintiff's primary problem was narcotic abuse was support by substantial medical evidence. Indeed, numerous doctors documented the problem. (Tr. at 208 – Dr. Morgan; 211– Dr. Finger; 244 – Dr. Harvey; 255 & 473 – Dr. Dias; 273 – Dr. Espiritu; 289-90 – Dr. Ansari; 402-03 – Dr. Kraemer; 423 – Dr. Swanson; 435, 440, 484 – Dr. Smrecek; 476-79 – Dr. Kavan; 482 – Dr. Catania.) It is true, as plaintiff notes, that doctors kept prescribing her narcotics, but this was often against their better judgment and/or after plaintiff pressured them (<u>see, e.g.</u>, Tr. at 248, 450) or doctor-shopped until she found a physician who would comply with her requests (<u>see, e.g.</u>,Tr. at 165, 167, 417, 425, 467, 473, 475,

---

[18]In her reply brief, plaintiff essentially concedes the point, stating that she disagrees with the ALJ's finding that she is not disabled, which is why she has appealed. She states that if the decision is reversed and if on remand the ALJ finds her disabled, he will then have to decide whether substance abuse caused her disability. (Pl.'s Reply Br. at 4.)

482).[19]  The treating doctors were essentially unanimous in concluding that she had a serious problem with narcotics.  (See, e.g., Tr. at 171, 275, 415, 419, 442.)[20]

## 2.    Source of Headache Pain (Somatoform Disorder)

Plaintiff notes that some of her doctors believed that her headaches were likely caused by stress, a psychosomatic pain disorder, or were psychogenic in nature.  Other physicians speculated that the headaches had a physical cause – psoriasis, drug rebound or TMJ problems.  In rejecting plaintiff's claim that her headaches were debilitating, the ALJ noted that neurologic work-up had been negative, and that migraines had been ruled out.  Plaintiff argues that by looking for a physical cause of her pain, the ALJ contravened Carradine v. Barnhart, 360 F.3d 751 (7th Cir. 2004).

In Carradine, the court reversed where the ALJ rejected the claimant's pain complaints without appreciating the difference between pain of psychological origin and feigned pain.  Id. at 754-55.  The ALJ remarked on the absence of objective medical evidence substantiating the claimant's alleged pain, notwithstanding the fact that the absence of such evidence was consistent with a psychological origin of pain.  Id. at 755.  The ALJ noted that the claimant had undergone extensive treatment for pain but

---

[19]See also n.23, infra.

[20]Plaintiff states that no doctor found that she had substance addiction.  Not so.  On July 1, 2003, Dr. Espiritu stated that he was "very leery about her possible drug dependence."  (Tr. at 272.)  On August 18, 2004, Dr. Kraemer found that plaintiff had a "definite dependency on narcotic medications of large quantities."  (Tr. at 419.)  On August 27, 2004, Dr. Eisma suggested that plaintiff enter a detox program to get off Vicodin because she was "most likely dependent on this pain medication."  (Tr. at 415.)  The ME also evaluated plaintiff under the Listing for substance addiction disorders.  (Tr. at 513-14.)

improperly rejected that evidence, stating that the claimant's doctors merely accepted her

pain complaints at face value.  The court held:

> Since severe pain is consistent with "the absence of significant findings upon diagnostic testing and physical examination," which would not reveal a psychological origin of pain, the doctors had no choice but to take Carradine's complaints of pain "at face value" and treat her. What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits; likewise the improbability that she is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms.  Such an inference would amount to an accusation that the medical workers who treated Carradine were behaving unprofessionally.
>
> The administrative law judge could not get beyond the discrepancy between Carradine's purely physical ailments, which although severe were not a plausible cause of disabling pain, and the pain to which Carradine testified. He failed to take seriously the possibility that the pain was indeed as severe as Carradine said but that its origin was psychological rather than physical. The evidence that she presented went far beyond a merely self-serving, uncorroborated claim of pain by a malingerer.

Id. at 755 (internal citation omitted).

The present case is not like Carradine.  First, the ALJ appreciated the diagnosis of

somatoform disorder (Tr. at 17) and his obligation to consider the potentially disabling

effects of pain under the SSR 96-7p and 20 C.F.R. § 404.1529 (Tr. at 20), even though

pain is subjective and not susceptible to objective measurement (Tr. at 12).  Then,

adopting the opinions of the SSA consultant and the ME, the ALJ found that plaintiff could

engage in simple, routine, unskilled work at the light exertional level despite her

38

somatoform disorder.[21]  Thus, because the ALJ appreciated that plaintiff's pain could be caused by a psychological source – but that she was not, in any event, disabled – he did not commit the primary logical flaw that led to remand in Carradine.

Second, as the ALJ noted, there was ample evidence that plaintiff was engaging in drug seeking behavior and might be faking her symptoms to obtain narcotics.  Plaintiff's primary care physicians all noticed the problem.  In July 2003, Dr. Espiritu declined to prescribe OxyContin because he was leery of possible drug dependence, causing plaintiff to become angry and seek another doctor.[22]  (Tr. at 15; 272-73.)  Plaintiff then began seeing Dr. Swanson, and he noticed a similar pattern of inappropriate requests for narcotics.  Eventually, he established a drug contract with plaintiff, but she soon violated its terms, causing Dr. Swanson to discharge her from his care.  (Tr. at 17; 246; 423; 442.) Plaintiff then established care with Dr. Kraemer and began making improper demands for narcotics from him.  (Tr. at 402-03.)  Even plaintiff's pharmacist became involved based on concerns about her drug use.  (Tr. at 19; 211; 462.)  As the ALJ also noted, plaintiff engaged in doctor shopping in order to obtain narcotics when she was turned down.  (Tr. at 19.)  Further, various ICD and ER physicians questioned whether plaintiff was genuine. For example, on October 17, 2003, ICD Dr. Dias questioned whether plaintiff was really in pain or whether it was "an act."  (Tr. at 16; 255.)  On October 8, 2004, plaintiff sought narcotics from ICD Dr. Smrecek for chest pain, and he noticed that although she was

_____

[21]As the Commissioner notes, no doctor, not even Dr. Morgan, supported greater restrictions than adopted by the ALJ.

[22]It appears that after just two days as her treating physician, Dr. Espiritu spotted an issue with plaintiff's drug use and suggested alternatives.  (Tr. at 296.)

39

hunched over and reluctant to move, she was able to move without much difficulty. (Tr. at 412.) On May 12, 2005, ICD Dr. Catania found plaintiff "very strangely noncooperative during the exam" and demanding Vicodin. (Tr. at 482.) Thus, unlike in Carradine, where the claimant's doctors did not question her pain or her motives, plaintiff's doctors certainly did. Moreover, rejection of plaintiff's claims is not tantamount to accusing her doctors of unprofessional behavior. Plaintiff's doctors spotted her problem with narcotics and made numerous efforts to deal with it, while still attempting to address her problems.[23]

Third, plaintiff did not engage in the same extensive treatment as did the claimant in Carradine. Her treatment consisted almost exclusively of the use of narcotics, despite her doctors' reservations. Plaintiff notes that she did participate in a pain management program, but the record shows that her attendance was spotty and that personal problems impeded her progress. (Tr. at 426.) She underwent no surgery.[24]

Finally, Carradine does not stand for the proposition that the ALJ must accept the pain complaints of any claimant diagnosed with a psychosomatic disorder. As the court noted in that case, the rule that objective medical evidence need not support the claimant's testimony invites exaggeration. Alert to this possibility, it up to the ALJ to evaluate the claimant's credibility with great care. Id. at 753. In the present case, the ALJ's factual

---

[23]In her reply brief, plaintiff notes that her doctors continued to provide narcotics, even after questions about her drug usage were raised. However, plaintiff ignores the fact that she often obtained these pills from ICD or ER doctors, avoiding her primary care physicians. Drs. Kraemer and Kavan, her last two primary doctors, sought to put a stop to her use of narcotics. (Tr. at 420, 468.)

[24]Plaintiff points out that she did have Demerol injections in the left forehead. However, that procedure cannot be compared to the surgical implantation of a device in the spine, as in Carradine. Further, the record shows that eventually plaintiff rejected such injections, instead demanding Vicodin. (Tr. at 482, 488.)

40

findings were supported by substantial evidence, his conclusions were reasonable, and he built an accurate and logical bridge between the two. See Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001) ("Where an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion."). Therefore, his determination must be upheld.

### 3. Depression and Anxiety

Plaintiff next argues that the ALJ failed to properly consider her depression and anxiety, which were serious enough to twice warrant hospitalization. Plaintiff notes that her GAF at the time of her first admission was 40 and 50-60 on the second. However, as the ALJ noted, these admissions were both of short duration, and plaintiff was discharged in good condition with a GAF of 70, suggesting that she was functional.[25] (Tr. at 19.) Further, Dr. Morgan seemed to question plaintiff's motives in regard to the second admission. Specifically, he found that she was "rather dependent" and "somewhat manipulative," particularly given the circumstance of her threatening suicide over the phone with her husband when he was out of town. (Tr. at 335; 17.) Plaintiff told Dr. Morgan that her threats were not genuine and that it was "just stupid stuff." (Tr. at 334.) Dr. Morgan admitted her so she could contemplate what she had done and consider more appropriate coping methods. (Tr. at 337.) Finally, as the ALJ also noted, Dr. Morgan completed a questionnaire in late 2003, in which he opined that plaintiff's ability to understand, remember and carry out instructions was intact, as was her ability to respond appropriately

---

[25]The ALJ noted that plaintiff's GAF on the first admission was 40, but quickly improved to 70. (Tr. at 14.) As the ALJ also noted, the second admission occurred after plaintiff's insured status ended. (Tr. at 19.)

to supervisors, co-workers and routine work pressures and changes. (Tr. at 19; 219.) The ALJ's RFC was consistent with Dr. Morgan's report.

Plaintiff complains that the ALJ understated her treatment with Dr. Morgan, calling it "intermittent" (Tr. at 19), and failed to mention certain specific observations Morgan made. She also contends that the ALJ failed to recognize the psychological treatment she received as part of the pain management program. However, as noted above, the ALJ is not obligated to discuss in writing every piece of evidence in the record, Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999), and plaintiff points to nothing in these records undercutting the ALJ's conclusions.[26]

### 4.   Fibromyalgia

Plaintiff next contends that the ALJ erred in finding her not disabled despite her diagnosis of fibromyalgia. She notes that several doctors mentioned the condition, finding that she exhibited the trigger/tender points which are its hallmark. She contends that the ALJ could not reject these diagnoses just because the symptoms of the disease are subjective. See Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996).

However, the record contains substantial evidence justifying the ALJ's skepticism that plaintiff even had this condition, much less that it was disabling. Contrary to plaintiff's argument, the ALJ did not rely solely on Dr. Monev's statement that narcotics were not a proper course of treatment. As the ALJ also noted, there was little mention of pain related

---

[26]Further, as the Commissioner points out, plaintiff missed several of her appointments with Dr. Henke. (Tr. at 345; 347.) And, although plaintiff claims that Dr. Henke advised that Vicodin be continued, the records show that in February 2004 Dr. Henke suggested that the drug not be tapered off "as of yet." (Tr. at 345.) Dr. Schultz, who supervised the program, suggested that she stop the analgesics and "go through a wash out period." (Tr. at 171.)

42

to fibromyalgia or any other musculo-skeletal problem in the records of treating physicians. (Tr. at 20.)

Further, the first mention of the disease came after Dr. Swanson provided plaintiff with a handout about fibromyalgia, after which she concluded that she had every one of its symptoms. (Tr. at 169, 199, 258.) She also asked Dr. Swanson for a referral to a rheumatologist because she believed a diagnosis of fibromyalgia would be helpful in her disability claim. (Tr. at 258.) Dr. Schultz, the pain specialist, stated that "though she feels she has fibromyalgia . . . it appears that this is more of a diagnosis that [Dr. Swanson] suggested she may have and she has taken this label and run with it so to speak." (Tr. at 169.)[27] No doctor imposed any restrictions based on fibromyalgia and, as the ALJ noted, the rheumatologist's conclusion that narcotics were not the way to treat fibromyalgia supports the conclusion that plaintiff engaged in drug-seeking behavior.

Finally, as with plaintiff's somatoform disorder, there is no requirement that an ALJ accept a claimant's complaints simply because they may be based on an "elusive and mysterious" disease incompatible with objective verification like fibromyalgia. Sarchet, 78 F.3d at 306. The fact that plaintiff exhibited trigger points consistent with fibromyalgia says nothing about its severity. Most people with fibromyalgia are not disabled, id. at 307, and substantial evidence support the ALJ's conclusion that plaintiff was one of them.

_____

[27]Plaintiff contends that because the ALJ did not specifically cite this evidence of possible fabrication, the court may not rely on it. However, this evidence merely offers further support for the reasonable and factually supported findings the ALJ did make. As the Seventh Circuit has recently re-affirmed, the court is not required (or indeed permitted) to remand even an inadequately explained finding if the result would be the same. Sanchez v. Barnhart, No. 05-2866, 2006 U.S. App. LEXIS 27461, at *4 (7th Cir. Nov. 7, 2006).

43

### 5.    Psoriasis

Plaintiff next claims that the ALJ improperly evaluated her psoriasis, finding that it was mild and controlled with treatment.  (Tr. at 19.)  Plaintiff notes that at times she had extensive psoriasis on the soles of her feet, with drainage and inflammation, and that she regularly received injections in various parts of her body.

Substantial evidence supported the ALJ's conclusion.  While plaintiff regularly sought treatment from Dr. Horan, he did not impose any restrictions on her ability to work based on the condition.  He specifically noted that she was able to walk, even when her foot psoriasis was at its worst,[28] while wearing tennis shoes and socks.  (Tr. at 428.)  In November 2002, Dr. Morgan noted that while plaintiff had diffuse patches of psoriasis, none were severe.  (Tr. at 157.)  Further, the evidence showed that plaintiff's psoriasis became aggravated only at certain times, such as when she was stressed by her daughter's upcoming wedding (Tr. at 414), and when she engaged in ill-advised activity such as attending the "foot party" (Tr. at 448), walking great distances in sandals (Tr. at 467), and failing to take her Methotrexate as directed (Tr. at 389).  Plaintiff noted improvement when she regularly took her medication.  (Tr. at 302, 307, 455.)  On July 13, 2004, Dr. Horan specifically noted that plaintiff's psoriasis was "doing quite well with the current routine."  (Tr. at 428.)

Plaintiff argues that the ALJ ignored certain evidence pertaining to her psoriasis, but, as noted above, he was not obligated to comment on every piece of evidence in the record. He gave proper consideration to this condition, and substantial evidence supported his

---

[28]Plaintiff's worst flare-up happened well after her insured status ended.  (Tr. at 448.)

44

findings.  See Henderson, 179 F.3d at 512 (stating that the court focuses on whether the record contains substantial evidence to support the ALJ's decision, not whether an alternate decision could also be reached).

**B.    RFC**

Plaintiff contends that the ALJ erred in determining her RFC.  RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the individual. Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling.  Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities.  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p.

In the present case, the ALJ found that plaintiff could perform light, unskilled to low level semi-skilled work where there was no prolonged standing or walking, only occasional crouching, bending or stooping, and limited interaction with the public. (Tr. at 20.) The ALJ noted that plaintiff's depression had been present long before she stopped working, and

she had been able to handle skilled work. Therefore, he concluded that she could do at least unskilled work. (Tr. at 20.)

Plaintiff argues that the ALJ failed to appreciate that since she stopped working her depression had escalated related to problems with her son, loss of a foster child to adoption, financial problems and relationship issues with her husband. She also contends that he ignored her testimony that she left the mortgage broker job because she became depressed and the telemarketer job because she had a breakdown. However, the ALJ found plaintiff's testimony of disabling symptoms not fully credible, for reasons he set forth at length. Further, he accepted the opinions of the SSA consultant, the ME and Dr. Morgan that plaintiff was able to work, despite the added stressors in her life. Plaintiff points to no medical evidence to the contrary.

Plaintiff next contends that the ALJ's RFC was inconsistent, in that he found her capable of light work – which requires a good deal of standing and walking, SSR 83-10 – then added that she could do no prolonged standing or walking. There was nothing inconsistent about the ALJ's finding; he concluded that she could perform a sub-set of light work, then relied on a VE to identify jobs she could do within those capabilities. This was not a case where the ALJ relied on the Grid despite limiting the claimant to a less than full range of work. See Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994) (holding that the ALJ must consult a VE if the claimant cannot perform a full range of work at a certain exertional level).

Plaintiff also argues that the ALJ failed to consider all of the evidence in finding her capable of light work, ignoring the evidence of pain from fibromyalgia, tension headaches

46

and psoriasis. Not so. As discussed above, the ALJ considered these ailments but concluded that they were not disabling.

Finally, plaintiff contends that the ALJ ignored evidence contrary to his conclusion. Specifically, he did not include the limitations found by SSA consultant Dr. Bauer – that she was moderately impaired in her ability to complete a normal workday without interruptions or breaks based on psychological symptoms and in her ability to set realistic goals or make plans independently of others. (Tr. at 234-35.) Nor did he include the moderate limitations in remembering and carrying out detailed instructions, maintaining attention for extended periods, working at a consistent pace without interruptions from symptoms, and dealing with supervisors and changes in the work setting found by Dr. Spears. (Tr. at 375-76.) However, as the Commissioner notes, neither doctor found that plaintiff was disabled, and Dr. Spears specifically found that she could perform simple, routine, low stress work within her physical limitations (Tr. at 377), consistent with the ALJ's finding (Tr. at 20). See Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002) (affirming where, although consultant found that the claimant was "moderately limited" in several areas, he went further and translated those findings into a specific RFC assessment, concluding that the claimant could still perform low-stress, repetitive work, upon which the ALJ relied).[29]

## C.    Step Five – Hypothetical Question to VE

Finally, plaintiff contends that the ALJ propounded an incomplete hypothetical question to the VE, rendering his testimony unreliable for purposes of meeting the

_____

[29]Plaintiff notes that the ALJ was required under SSR 96-8p to consider all of the evidence in setting RFC. The ALJ considered the reports of the SSA consultants, as well as the other evidence, and reached a reasonable conclusion on RFC. (Tr. at 20.)

47

Commissioner's burden at step five. Where the ALJ relies on a VE, his questions must incorporate all of the limitations that are supported by the medical evidence in the record. See, e.g., Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). If "the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." Young, 362 F.3d at 1005.

Plaintiff points out that the ALJ's hypothetical question to the VE varied somewhat from the RFC determination in the decision. Specifically, the RFC was for light work with no prolonged standing or walking (Tr. at 20), while the question assumed a person capable of light work who could sit or stand for six hours out of an eight hour day but could not stand for more than fifteen minutes at a time (Tr. at 519). Plaintiff also notes that the ALJ did not define "prolonged" standing or walking, in terms of time or distance, in his decision.

This does not appear to be a significant variance; both the question and the RFC placed limits on plaintiff's ability to be on her feet. Further, it appears that the hypothetical question upon which the ALJ relied was, if anything, more restrictive than the RFC (and thus more favorable to plaintiff). In any event, as the Commissioner notes, the issue does not warrant a remand because the VE also identified thousands of sedentary jobs – which do not required prolonged standing and walking, see SSR 83-10; see also 20 C.F.R. 404.1567 – plaintiff could do.[30] The court need not remand when there is no reason to

---

[30]In her reply brief, plaintiff offers no response to the Commissioner's argument about the significant number of sedentary jobs the VE identified.

believe that it would lead to a different result. <u>Sanchez</u>, 2006 U.S. App. LEXIS 27461, at

*4; <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989).[31]

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case

is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of November, 2006.


/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[31]For the reasons set forth above, the ALJ also did not err in failing to include in the hypothetical question all of the specific limitations contained in the mental consultants' reports.  In her reply brief, plaintiff also claims that the ALJ omitted limitations suggested by the ME, but she does not specify those limitations, waiving any argument based on them.  <u>See</u> <u>Weinstein v. Schwartz</u>, 422 F.3d 476, 477n.1 (7th Cir. 2005) (stating that undeveloped arguments are waived).

49